Marianne Dugan, Attorney
OSB # 93256
259 E. 5th Ave., Suite 200-D
Eugene, OR 97401
(541) 338-7072
Fax 866-650-5213
mdugan@mdugan.com

Attorney for Plaintiffs

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PENDLETON DIVISION

| | |
|---|---|
| ALLEN HAMILTON and LOIS HAMILTON, | CASE NO. D. Or. 09-cv-01094-SU |
| Plaintiffs, | |
| | PLAINTIFFS' RESPONSE TO MOTION FOR SUMMARY JUDGMENT |
| v. | |
| | REQUEST FOR ORAL ARGUMENT |
| SILVEN, SCHMEITS AND VAUGHAN, P.C., and ALAN J. SCHMEITS, | |
| Defendants. | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

SUMMARY JUDGMENT STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A.    History of the Property . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    B.    Evidence of 2,4-D Use and Contamination . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    C.    Plaintiffs' Symptoms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    D.    2,4-D Concerns and Studies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    E.    The Underlying Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

I.    PLAINTIFFS HAVE PRESENTED SUFFICIENT EVIDENCE ON THEIR CLAIM FOR TRESPASS AND ON DAMAGES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    A.    Plaintiffs Have Presented Sufficient Evidence on Liability . . . . . . . . . . . . . . . . 19

    B.    Plaintiffs Have Presented Sufficient Evidence of Damages from the Trespass . 22

II.    PLAINTIFFS' HAVE PRESENTED SUFFICIENT EVIDENCE TO SUPPORT THEIR CLAIM FOR OWNERSHIP BY ESTOPPEL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

III.    PLAINTIFFS HAVE PRESENTED SUFFICIENT EVIDENCE TO SUPPORT THEIR CLAIM FOR EASEMENT BY PRESCRIPTION/ADVERSE POSSESSION . . . . . . . 25

IV.    PLAINTIFFS HAVE PRESENTED SUFFICIENT EVIDENCE TO SUPPORT THEIR CLAIM FOR EASEMENT BY IMPLICATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

V.    PLAINTIFFS HAVE PRESENTED SUFFICIENT EVIDENCE TO SUPPORT THEIR CLAIM FOR FRAUD IN THE SALE OF REAL PROPERTY . . . . . . . . . . . . . . . . . . . 28

VI.    PLAINTIFFS CONCEDE THREE CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

# TABLE OF AUTHORITIES

## CASES

Almond v. Anderegg, 276 Or. 1041, 557 P.2d 220 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Arboireau v. Adidas-Salomon, 347 F.3d 1158 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . 3, 28

Banks v. Martin, 78 Or. App. 550, 717 P.2d 1192 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Bella v. Aurora Air, Inc., 279 Or. 13, 566 P.2d 489 (1977) . . . . . . . . . . . . . . . . . . . . . . . 14, 19, 20

Bloomfield v. Weakland, 193 Or. App. 784, 92 P.3d 749 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . 27

Brown v. Johnston, 258 Or. 284, 482 P.2d 712 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Cheney v. Mueller, 259 Or. 108, 485 P.2d 1218 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Clark v. Hindman, 46 Or. 67, 79 P. 56 (1905) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Davis v. Parke, 135 Or. App. 283, 898 P.2d 804 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Disabled Rights Action Committee v. Las Vegas Events, Inc., 375 F.3d 861 (9th Cir. 2004) . . 15

Doe v. American Red Cross, 322 Or. 502, 910 P.2d 364 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . 23

Edwards v. Saleen-Degrange, 161 Or. App. 156, 984 P.2d 854 (1999) . . . . . . . . . . . . . . . . . . 3, 28

Edwards v. Talent Irrigation District, 280 Or. 307, 570 P.2d 1169 (1977) . . . . . . . . . . . . . . . . . 22

Elizaga v. Kaiser Foundation Hospitals, Inc., 259 Or. 542, 487 P.2d 870 (1971) . . . . . . . . . . . 29

Faulconer v. Williams, 147 Or. App. 389, 936 P.2d 999 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Fonseca v. Sysco Food Services of Arizona, Inc., 374 F.3d 840 (9th Cir. 2004) . . . . . . . . . . . . . 3

Garrett v. Lundgren, 41 Or. App. 23, 596 P.2d 1318 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Garrett v. Mueller, 144 Or. App. 330, 927 P.2d 612 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Gearhart v. Goehner, 74 Or. App. 95, 701 P.2d 461 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Gerdes v. Bohemia, 88 Or. App. 62, 744 P.2d 275 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Haag v. Cembellin, 89 Or. App. 75, 748 P.2d 143 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Harpole v. Paeschke Farms, Inc., 267 Or. 592, 518 P.2d 1023 (1974) . . . . . . . . . . . . . . . . . . 14

Heise v. Pilot Rock Lbr. Co., 222 Or. 78, 352 P.2d 1072 (1960) . . . . . . . . . . . . . . . . . . . . . . . 29

Holland v. Lentz, 239 Or. 332, 397 P.2d 787 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Hopkins v. State of Oregon, 96 Or. App. 717, 775 P.2d 825 (1989) . . . . . . . . . . . . . . . . . . . . . 26

Howard v. Merrick, 145 Or. 573, 27 P.2d 891 (1933) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

In re Greene, 290 Or. 291, 620 P.2d 1379 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

In re Para, 2006 WL 2790451 (N.D. Cal. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Kinkade v. Markus, 38 Or. App. 131, 589 P.2d 1142 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Kitzerow v. Reinhardt, 74 Or. App. 582, 704 P.2d 132 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . 26

Kondor v. Prose, 50 Or. App. 55, 622 P.2d 741 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Krause v. Eugene Dodge, Inc., 265 Or. 486, 509 P.2d 1199 (1973) . . . . . . . . . . . . . . . . . . . . . 29

Loe v. Lenhardt, 227 Or. 242, 362 P.2d 312 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

Lowe v. Philip Morris USA, Inc., 344 Or. 403, 183 P3d 181 (2008) . . . . . . . . . . . . . . . . . . . . 23

Macca v. Gen. Telephone Co. of N.W., 262 Or. 414, 495 P.2d 1193 (1972) . . . . . . . . . . . . . . 22

Manderscheid v. Dutton, 193 Or. App. 9, 88 P.3d 281 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . 25

Martin v. Reynolds Metals Co., 221 Or. 86, 102, 342 P.2d 790 (1959) . . . . . . . . . . . . . . . . 19, 20

McGregor v. Barton Sand & Gravel, Inc., 62 Or. App. 24, 660 P.2d 175 (1983) . . . . . . . . . . . 22

Millikin v. Green, 283 Or. 283, 583 P.2d 548 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Morton v. United Parcel Service, 272 F.3d 1249 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . 5

Musgrave v. Lucas, 193 Or. 401, 238 P.2d 780 (1952) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Oliver v. Keller, 289 F.3d 623 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Oregon v. Miller, 53 Or. App. 493, 632 P.2d 493 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 28

Overton v. Blake, 274 Or. 91, 544 P.2d 1037 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Palmer v. Pioneer Inn Associates, Ltd., 257 F.3d 999 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . 3

Patterson v. Western L. & B. Co., 155 Or. 140, 62 P.2d 946 (1936) . . . . . . . . . . . . . . . . . . . . . 30

Pennebaker v. Kimble, 126 Or. 317, 269 P 981 (1928) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Penny v. Burch, 149 Or. App. 15, 941 P.2d 1049 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Reisland v. Schick, 111 Or. 42, 224 P. 827 (1924) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Reynolds Metals Company v. Lampert, 316 F2d 272 (9th Cir 1963) . . . . . . . . . . . . . . . . . . . . . 21

Sams v. Geico Corp., CV No. 01-1458-BR, 2002 WL 31975065 (D. Or. 2002) . . . . . . . . . . . . 15

Satchell v. Dunsmoor, 179 Or. 463, 172 P.2d 826 (1946) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

School Dist. No. 1J, Multnomah County, Or. v. ACandS, Inc., 5 F.3d 1255 (9th Cir. 1993) . . . 10

Slak v. Porter, 128 Or. App. 274, 875 P.2d 515 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Smo v. Black, 93 Or. App. 234, 761 P.2d 1339 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Springer v. Durrette, 217 Or. 196, 342 P.2d 132 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

State v. Chemical Waste Storage & Disposition, Inc., 19 Or. App. 712, 528 P.2d 1076
(1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

State v. Krummacher; 269 Or. 125, 523 P.2d 1009 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 28

Taal v. Union Pacific Railroad Co., 106 Or. App. 488, 809 P.2d 104 (1991) . . . . . . . . . . . . . 3, 28

Thompson v. Schuh, 286 Or. 201, 593 P.2d 1138 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n., 809 F.2d 626 (9th Cir. 1987) . . . . . . . 3

Tyska v. Prest, 163 Or. App. 219, 988 P.2d 392 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Venture Properties v. Parker, 223 Or. App. 321, 195 P.3d 470 (2008) . . . . . . . . . . . . . . . . . . 3, 28

Vote v. U.S., 753 F. Supp. 866 (D. Nev. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Wayt v. Buerkel, 128 Or. App. 222, 875 P.2d 499 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Whitlatch v. Bertagnolli, 45 Or. App. 985, 609 P.2d 902 (1980) . . . . . . . . . . . . . . . . . . . . . . . 29

Worman v. Columbia County, 223 Or. App. 223, 195 P.3d 414 (2008) . . . . . . . . . . . . . 4, 19-20

Zehr v. Haugen, 318 Or. 647, 871 P.2d 1006 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

Zeleny v. Karnosh, 224 Or. 419, 356 P.2d 426 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

**STATUTES**

O.R.S. chapter 634 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 20

O.R.S. 634.005 (former O.R.S. 634.012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 20

O.R.S. 634.012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

O.R.S. 634.016(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 20

O.R.S. 634.026 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 20

O.R.S. 634.322(10) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 20

O.R.S. 634.372(21) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 20

**RULES AND REGULATIONS**

Fed. R. Civ. P. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Fed. R. Evid. 201 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Fed. R. Evid. 901(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Fed. R. Evid. 901(b)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Fed. R. Evid. 902(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Fed. R. Evid. 902(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**OTHER AUTHORITIES**

Prosser on Torts § 109 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Restatement of Property § 476 (1944) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Plaintiffs object to defendants' motion for summary judgment.

## SUMMARY JUDGMENT STANDARD

The Court may grant summary judgment only if there are no genuine issues of material fact and if the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law governing a claim or defense determines whether a fact is material. T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n., 809 F.2d 626, 630 (9th Cir. 1987).

The Court must view the facts in the light most favorable to the non-moving party. Oliver v. Keller, 289 F.3d 623, 626 (9th Cir. 2002). The court generally must take the plaintiff's affidavit or declaration as true and sufficient evidence in summary judgment. Fonseca v. Sysco Food Services of Arizona, Inc., 374 F.3d 840 n. 2 (9th Cir. 2004); Palmer v. Pioneer Inn Associates, Ltd., 257 F.3d 999 (9th Cir. 2003) (overturning summary judgment because plaintiff's own affidavit was enough to present a *prima facie* case).

Credibility and weight of the witness's testimony are questions of fact. State v. Krummacher; 269 Or. 125, 144, 523 P.2d 1009 (1974); Oregon v. Miller, 53 Or. App. 493, 498, 632 P.2d 493 (1981). "[W]hen a trial court is confronted with a nonmoving party's inconsistent statements, it may not evaluate the credibility of an explanation in the later of the statements to resolve the factual conflict. Taal v. Union Pacific Railroad Co., 106 Or. App. 488, 494, 809 P.2d 104 (1991)." Edwards v. Saleen-Degrange, 161 Or. App. 156, 984 P.2d 854 (1999) (reversing summary judgment where affidavits gave conflicting versions of events).

Whether alleged misrepresentations were "material" or "substantial" is an issue of fact. Arboireau v. Adidas-Salomon, 347 F.3d 1158 (9th Cir. 2003); Venture Properties v. Parker, 223 Or. App. 321, 353, 195 P.3d 470 (2008).

The jury, of course, would be entitled to find that Peterson is not credible, given his interest in the outcome of the litigation. [n. 5 - We do not mean to suggest that Peterson's testimony should be disbelieved. Rather, the point is that **a jury is always entitled to disbelieve a witness who has an interest in the outcome of the litigation**. <u>See Hindman v. Coy</u>, 207 Or. 279, 284, 295 P.2d 1097 (1956) (the jury is the "sole judge of the credibility of the witnesses and of the weight of the evidence" and is "not required to believe the testimony of * * * the plaintiff or of any other witness"); <u>see also</u> <u>Fatehi v. Johnson</u>, 207 Or. App. 719, 730, 143 P.3d 561, <u>rev. den.</u>, 342 Or. 116, 149 P.3d 138 (2006) (jury entitled to disbelieve a witness "thought by the jury to have an interest in the outcome of the litigation"). If that is the case at trial, the burden should not be any higher for a plaintiff at the summary judgment stage.

<u>Worman v. Columbia County</u>, 223 Or. App. 223, 233, 195 P.3d 414 (2008) (emph. added).

**FACTUAL BACKGROUND**

The most important facts are set out in the Response to Concise Statement of Material Facts, but plaintiffs provide additional background for the court.

**A.     History of the Property**

In 1968, Ed Elms purchased P&E Distributing. Ex. D at 6 lns16-19; at 10 lns 22-23. In 1979, Ed Elms and his then business partner purchased 1200, in Block 7, McCrary's Addition, in Baker City, Baker County, Oregon. Ex. C at 2 (Elms pleading in underlying case). That property is shown on the plat map which is Exhibit A. It indicates that tax lot 1200 is divided into five separate parcels, numbered 1-5. Tax lot 1200 also includes half of Sixth Street, which was vacated by Baker City Ordinance in 1977. Ex. C at 2.

At some point Elms split the property. In 1982 Elms had a survey which stated on its face that it was done "for the purpose of monumenting property lines for fence construction." Ex. B; <u>see</u> Ex. W at 2. Elms testified in an affidavit that he knew as of that date where his property lines were. Ex. W at 2. He built a fence running east/west. Elms built the fence himself. Ex. D at 6-11.

Four years later Ed Elms purchased his business partner's interest in the property. Ex. C at 2. That year Elms conveyed lots 1, 2, and the south ten feet of lot 3 of tax lot 1200 to the Hansens. Ex. X at 5. This is the property the Hamiltons ended up purchasing later, 2520 Myrtle Street in Baker City. The Hansens owned the property until 1988, at which time it was transferred back to Elms. Ex. X at 6, 7. Mrs. Hansen states in affidavit that she used the area up to the fenceline and believed it to be her property. Aff. of Hansen.[1] She also states that the Hansens used Sixth Street as their primary access to the rear of their property. Id.

In 1992, Elms sold the property to Joe and Lisa Emery, including half of the vacated Sixth Street, excepting the east 15 feet of the vacated street. This property is now identified as tax lot 900, as shown on Exhibit T; see also Exhibit U. Early on in the underlying litigation, Emery stated in writing that he used the property up to Mr. Elms' 8-foot chain link fence without any problems; and that it was his understanding that all of the property/yard on the South side of Mr. Elms' fence was part of the property he purchased from Elms. Exhibit F.[2] In deposition he explained that he used that area for "part of the yard" and it was grassy. Ex. G at 38 ln 22 to 39 ln 4.

Emery stated that he used the back entrance to the property and entered the back property

---

[1] If there are some statements in these declarations that are not admissible, the appropriate remedy is for the Court not to rely on those inadmissible statements, rather than striking the document. See Morton v. United Parcel Service, 272 F.3d 1249 (9th Cir. 2001).

[2] This statement, although unsworn, is admissible for two reasons. First, Emery acknowledged in his deposition, under oath, that it was his statement, that he read it before signing it, and that it was his signature; and the statement was thoroughly discussed in that deposition. Ex. G at 12-13, 19, 26-27, 30-31, 32. Second, the document was used in deposition to impeach Emery's later statement regarding that he knew that Elms owned the five feet south of the fenceline. Id. at 13-14, 30-31.

by using Sixth Street; and that there was never any problem brought to his attention by Mr. Elms or his family or associates regarding his regular use of the Sixth Street entrance which included the 15-foot strip.  Exhibit F.

The underlying case involves a five-foot disputed strip directly north of the Hamilton's (previously Emery's) surveyed property line (south of Mr. Elms' chain link fence), which is highlighted in yellow in Exhibit T (not to scale).  <u>See</u> Ex. C; Ex. W at 3 ¶ 8.  Exhibit T is the tax assessor map with markings that were placed on that map by Elms in the underlying litigation (<u>see</u> Ex. C) – a dotted line apparently indicating Elms' approximation of the fence location.

The other area disputed in the underlying lawsuit was the east 15 feet of the western half of the vacated Sixth Street.  This strip is highlighted on Exhibit T with the color blue.  In the underlying lawsuit, the Hamiltons claimed an easement interest in that area (under various theories as explained herein).

In a recent deposition, Mr. Emery did an about face from his early statement and insisted that his use of the five feet south of Elms' fence had always been with Elms' permission.  However, the factfinder is entitled to disbelieve this because of his prior inconsistent written statement, which he acknowledged in deposition is his signed statement (<u>see</u> footnote 2 *supra* at 3).  Furthermore, not long after Emery signed that early statement, Elms and his attorney asked to speak with Emery about this (<u>see</u> Ex. G at 14 ln 23 to 15 ln 5; at 32 ln 10 to 33 ln 9), allowing the factfinder to infer that he was cajoled or pressured into changing his story.  In deposition, he made the strange statement that "they asked me to come into his office.  And then that's where I went truthful in what I've said."  Ex. G at 32 lns 20-22.

Mr. Emery did disagree with Mr. Elms even in his deposition on one significant point –

he insisted that Mr. Elms never came over to the south side of the fence and never used that area in any way. Ex. G at 48 lns 4-14. "He never come in on the south side. Just, he never come in there at all. He stayed on the north side." Id. lns 12-13. Even Elms stated in his deposition that that five-foot strip was maintained by Emery. Ex. D at 20 lns 10-21.[3]

In addition to the fence as an apparent property line delineator, the old garage at the back of the property (a couple of feet from the fence) actually straddles the surveyed property line. Elms has insisted that the garage, which encroaches on his property by a couple of feet, was moved onto his property by the Hamiltons. Several affiants refute that statement. Aff. of Deana Glenz at 1; Aff. of David Hamilton at 1; Aff. of Christy Hamilton at 1. The building is very old and dilapidated. Contrary to Elms' assertions, it is not on skids. It has sunken down into the ground through the years. Allen Hamilton Decl. ¶ 2; Lois Hamilton Decl. ¶ 6. Elms stated the garage has been moved twice - once by him, closer to the south end of what is now the Hamilton's property; and once by the Hamiltons, back to its encroaching position, though he did not see it happen, "didn't realize they had done that"; and doesn't know when it was moved. Ex. D at 13 ln 7 to 14 ln 8; at 15 lns 5-17. Mr. Emery, under oath, disagreed with Elms that the garage had been moved. Ex. G at 39 ln 22 to 40 ln 6. He stated in deposition, "I think anybody looking at it would know that it hadn't been moved. It's been there a long time." The plaintiffs attest that they did not move the garage. Decl. of Allen Hamilton ¶ 2; Decl. of Lois Hamilton at 2 ¶ 6.

---

[3] Elms also insists that he did not spray that area, at least not after the Hamiltons purchased the property, but as explained *infra* at 8-9, a reasonable factfinder could disbelieve that self-serving statement because it is contradicted by other statements he made and by circumstantial evidence of odor and damage to plants.

When asked about the "driveway" off of Myrtle Street (paralleling Sixth Street) – which plaintiffs dispute was a driveway, as discussed *infra* at 7 – Mr. Emery stated in deposition that he used it daily, but later stated he sometimes parked his RV in his driveway and used Sixth Street to access the back of the property. Ex. G at 44 ln 18 to 45 ln 7; at 45 ln 21 to 46 ln 6. Although there is a dispute about whether there even was a "driveway" (and summary judgment is therefore not appropriate), there is no dispute that both Emery and Hamiltons parked recreational vehicles in that area. See *infra* at 7.

The Emerys conveyed their interest in the property to American General Finance, Inc., by a deed in lieu of foreclosure on May 4, 2001. Ex. C at 2. Defendants Hamilton purchased the property from American General Finance, Inc., on January 14, 2002. Id.

Mr. Hamilton had earlier suffered from a severe work-related toxic exposure in a welding incident. He was concerned about avoiding further chemical exposure and was looking forward to the family growing their own food without chemicals, in a garden at the back of the property (near Elms' fence) and establishing a health food store in a little shed the Hamiltons moved to the front of the property (which was zoned commercial). Allen Hamilton Decl. ¶ 1-2; Lois Hamilton Decl. ¶ 1-2.

From the time they bought the property in 2002 until late 2005, the Hamiltons had never been told they did not own all the property up Mr. Elm's fence. Allen Hamilton Aff at 1. The fence was obviously very permanent and long-standing – the posts were set in concrete; it was eight feet high chain link, with barbed wire on top of it. Id. The Hamiltons reasonably believed this to be their north boundary. Id.

Mr. Elms never notified the Hamiltons that he owned five feet of the property south of

the fence and that the boundary line ran through the back two and a half feet of their garage, until late in 2005. That was right after Elms bought the lot to the east of the Hamiltons' property, from Mr. Gibbs, at which time Elms claimed he had had a survey done. Aff. of Lois Hamilton at 5; Aff. of Allen Hamilton at 3.[4] The Hamiltons had, until that time, been using the property and garage south of the guard fence believing it was their property.

Sixth Street is a well-established road and the Hamiltons used it to access their wood shed, old garage, root cellar, back door and parking area in the back of their house. Allen Hamilton Aff at 1. There was a yard fence along Sixth Street, and the Hamiltons state that the area between the fence and Sixth Street was not a driveway; rather, it was a small area with enough room to park a camp trailer and it had grass growing along the area. Id. The Hamiltons parked their camp trailer for several years until they sold it. Id.

Elms was attempting to expand his business property, and in addition to purchasing the lot to the east and vacating Sixth Street, in 2005 he successfully sought to vacate part of Grace Street, which runs east-west north of his property, to help with the maneuvering of his trucks. Ex. D at 23 ln 24 to 24 ln 1; at 29 lns 17-22. In the fall of 2005 after Elms bought that land, he knocked at the Hamiltons' door and told them he was going to block off and fence the Sixth Street access to the area in the back of the Hamiltons' house, wood shed, garage, and root cellar. Allen Hamilton Decl. ¶ 2. The Hamiltons immediately wrote him at letter objecting that Sixth Street was a long-established access to their property. Id.

//////

---

[4] It was only later, in litigation, that the Hamiltons learned that Mr. Elms had in fact had a survey done in 1982 and asserted that at that time – before he sold the property to Emery or to Hamilton – he knew exactly where the boundary lines were. Ex. B; Ex. W at 2.

## B. Evidence of 2,4-D Use and Contamination

Elms does not have a pesticide license. Ex. D at 19 lns 8-19. Elms sprayed the chemicals himself. Id. at 30 lns. 12-17. Elms stated in an affidavit that he "always" maintained the five foot strip south of his fence by "spaying [sic] weed eradicating chemicals from time to time." Ex. E at 3 ¶ 6. Elms acknowledged in deposition that the "weed eradicating chemical" he sprayed in that strip was 2,4-D. Ex. D at 21 lns 7-8. Mr. Emery stated that when he owned the property Elms "always sprayed" the area by the fence – several times a year – but would give him notice that he was going to do so, so he could remove children's toys, for example. Ex. G at 39 lns 8-21.

Elms stated in a 2007 affidavit that after the Hamiltons bought the property he "continued to do weed control along the five foot strip." Ex. W at 3 ¶ 10. In deposition more recently he denied spraying while the Hamiltons lived there. As explained in the statement of facts, there is a hotly disputed issue of fact regarding that. At most, the discrepancy in Elms' testimony creates a question for the finder of fact. See School Dist. No. 1J, Multnomah County, Or. v. ACandS, Inc., 5 F.3d 1255 (9th Cir. 1993).

In the spring of 2006 the Hamiltons visited their daughter in Washington and were gone for about a month. When they came back to their property on June 11, 2006, about 2:30 a.m. they noticed a very strong chemical odor. Allen Hamilton Aff. at 2. The next morning Mr. Hamilton went to work logging, and on getting home that evening he and Mrs. Hamilton went through the garden and they saw everything was dying and could smell chemicals. Id. The weekend of June 24 and June 25 Mr. Hamilton rototilled, and his wife and he replanted much of the garden that had been killed by the chemicals. Mrs. Hamilton would spend every day

working in the garden while Mr. Hamilton was at work and when he came home at night there was a very strong chemical smell.  Id.

Mrs. Hamilton was getting very sick and Mr. Hamilton felt very sick at the stomach like he was going to throw up; and he started to get hot flashes like he was burning up and he had a rash on his legs that was getting worse.  Id.  Mrs. Hamilton was experiencing similar problems as well as being very dizzy, fatigued, and confused, running into walls and unable to wake up in the morning.  Id. at 3; Lois Hamilton Aff. at 3.

On June 30, 2006, Mr. Hamilton came home early from work and there was a terrible chemical smell at their property; it was burning his eyes.  Aff. of Allen Hamilton at 3.  The Hamiltons called the police and upon advice of police put up a camera; but was unable to get anything on video.  Id.  On July 2, 2006, Mr. Hamilton went out to the garden and saw more garden plants dying from the chemicals so they again called the police.  Id.; see Ex. I (photos). Mr. Hamilton watched as an officer measured dying plants in their garden 15 feet from the fence. Aff. of Allen Hamilton at 3.  July 16, 2006, the Hamiltons were feeling sick, which they attributed to the chemicals, so they called Poison Control and upon their advice left the house and stayed with relatives.  Id.

On July 22, 2006, the Hamiltons followed the appropriate chain of command and took a soil sample from their garden area six feet from the fence, and sent it to Valley Environmental Laboratory for analysis to try to find out what chemical was being applied to their garden vegetables.  Id. at 3, 5; Ex. H; Aff. of Allen Hamilton at 3, 5; Aff. of Lois Hamilton at 6.  The lab report (which at the top documents that the sample was taken six feet from the fence), stated: "Abnormally high levels of 2,4-D found in this soil sample – Indicates recent treatment with 2,4-

D."  Ex. H.

Defendants cite their Exhibit 32 (a letter from Oregon Department of Agriculture) for the proposition that the 2,4-D in the contaminated <u>soil</u> that was tested was at levels "recognized as acceptable for consumption."  Defs' Br. at 24.  First, 2,4-D "degrades rapidly" in soils.  Ex. K at 7.  Second, the Hamiltons were not eating soil, but rather had been eating the fruits of their garden, for years, before they learned about the spraying.  More importantly, that letter stated:

The laboratory analysis confirmed the presence of 2,4-D at the level of **0.11 mg/Kg**.

. . .

The Oregon Department of Agriculture, Pesticides Division, requested Dr. Fred Berman, Director of the Center for Research on Occupational and Environmental Toxicology (CROET), Oregon Health Sciences University, review the level of pesticide residue detected in the soil sample and determine if this level is of concern relative to human health or the environment.  Dr. Berman's review indicated that **2,4-D residues rarely exceed 1 mg/kg in agricultural soil, except where there has been a spill or when the herbicide was used in quantities that far exceed the rates applied in normal forest or agricultural practice.**

Ex. 32 at 1 (emph. added).  In other words, the amount of 2,4-D on the Hamiltons' property resulted from either a "spill" or from application of the herbicide "in quantities that far exceed" the normal rates of application.  The only evidence in the record of anyone applying 2,4-D is of Mr. Elms doing so.

On July 22, 2006, Mrs. Hamilton felt very ill, which she attributed to the chemicals, and she threw a few of her clothes in the car and left.  Lois Hamilton Aff. ¶ 3; Allen Hamilton Aff. ¶ 3.  The chemical smell was so terrible Mr. Hamilton spent that night at his relative's house.  He left for Washington state a few days later.  Allen Hamilton Aff. ¶ 3.

Defendants' Exhibit 33 is an affidavit from the underlying case, which defendants assert demonstrates there was "no detection of 2,4-D in the soil taken from Plaintiffs' property" many

months later, in January 2007.   First, that does not prove that the 2002 through 2006 application of 2,4-D by Mr. Elms did not expose the plaintiffs and trespass on plaintiffs' property during that period – as noted *supra*, 2,4-D degrades rapidly in soil.  Second, that report does not state where the soil was taken from.  In contrast, the report from 2006 is labeled as being on soil that came from six feet south of Mr. Elms' fence.[5]

A year after the spraying that forced plaintiffs out of their home, homeowners insurance inspectors at the home wrote in their report in July 2007:  " We noted a strange odor while walking around measuring the dwelling and also experienced watering eyes while on the property. "  Ex. V.

### C.      Plaintiffs' Symptoms

Plaintiffs noticed rashes, blurry vision, fatigue, and memory problems starting in 2003, and recurring until they moved off the property in 2006.   Allen Hamilton Aff. at 2; Lois Hamilton Aff. at 3; Kimberlee Brown Aff.; Deana Glenz Aff.   During that period plaintiffs noticed impacts to their garden plants as well, with potatoes and tomatoes suddenly dying; they dug them up and ate them, before they knew that their garden was being sprayed with 2,4-D. Alan Hamilton Aff. at 2; Lois Hamilton Aff. at  3, 5; Ex. I.

In the summer of 2006 the spray odor became obvious and the Hamiltons suffered from rashes and burning eyes and were sick to their stomach.  Alan Hamilton Aff. at 2; Lois Hamilton Aff. at 1-3.  Deana Glenz, Christy Hamilton, and David Hamilton testify in their affidavits that

---

[5]  The January 2007 report does shows that there was DDT found in the soil that was tested.  Ex. 33 at 3 and 5.  Such evidence, combined with the clear – and dramatic – 2,4-D readings in 2006, could be taken by a factfinder as additional circumstantial evidence that Mr. Elms sprayed regularly and heavily in this area.

they smelled the chemicals, saw the dying plants, and saw the rashes on the Hamiltons. 2,4-D produces a "distinct odor." State v. Chemical Waste Storage & Disposition, Inc., 19 Or. App. 712, 721, 528 P.2d 1076 (1974). It also produces "distorted foliage." See Harpole v. Paeschke Farms, Inc., 267 Or. 592, 601 n. 2, 518 P.2d 1023 (1974). Although 2,4-D standing alone is not a skin irritant, the liquid mixtures contain many undisclosed binders and other ingredients, and contain a "skin irritant" warning. Ex. J at 1.

The extent of the plaintiffs' garden that was harmed by Elms's spraying was at least 15 feet from the fence. Mrs. Hamilton was dizzy from the chemicals; she "started running into the walls like I was drunk and then I couldn't wake up in the morning; it felt like I was drugged." Lois Hamilton Aff. at 3; Allen Hamilton Aff. at 3.

The Hamiltons do not have health insurance, limiting their access to medical care. Lois Hamilton Aff. at 4, 6. Nonetheless, Lois Hamilton did see doctors in 2004 and again in 2009 and to the present for her symptoms, as explained in Response to Statement of Fact ¶ 8. She was diagnosed at various times with anemia requiring a hysterectomy (2004), hypothyroidism, "fatigue," and most recently, non-Hodgkins lymphoma. Resp. to SOF ¶ 8. Alan Hamilton, who has significant prior chemical sensitivity from his work-related welding incident (Allen Hamilton Aff. at 2), in 2009 was diagnosed with fatigue, elevated blood pressure, and laryngopharyngeal reflux.

### D.    2,4-D Concerns and Studies

In Bella v. Aurora Air, Inc., 279 Or. 13, 566 P.2d 489 (1977), the Oregon Supreme Court reversed a directed verdict for defendants in a 2,4-D spraying case. The court went through case law about liability for chemical spraying which is discussed *infra* at 18. Regarding the facts

about 2,4-D, the court noted:

> [W]ith respect to 2,4-D the legislature itself has concluded that it falls within the concerns that prompted enactment of O.R.S. chapter 634, which are the danger of the regulated activities to **health, property, wildlife, and environment**. O.R.S. 634.012 [now 634.005], 634.016(6), 634.026. The 1973 revision of the statute specifically prohibited the use of "isopropyl ester of 2,4-D, or any other ester of equal or higher volatility with regard to plant damage" without a permit from the department, O.R.S. 634.372(21), and permits to use 2,4-D are to be issued only upon a determination that its use "will not damage agricultural and forest products and susceptible crops." O.R.S. 634.322(10).

279 Or. at 24-25 (emph. added).

Nor have these concerns proven to be wrong. In a 2009 study, researchers published in the Journal of Agromedicine a study finding that "[p]esticides associated with NHL [non-Hodgkins lymphoma] include phenoxyacetic acids (particularly 2,4-dichlorophenoxyacetic acid [**2,4-D**]), organochlorines (particularly chlordane, DDT, lindane, and toxaphene), organophosphates such as diazinon, dichlorvos, and malathion." Ex. L.[6] Those researchers noted that;

> 2,4-D, a pesticide that has been associated with the risk of NHL, is associated with lymphocyte replication and chromosomal aberrations in cytogenetic studies. In a study of farmers, 2,4-D was associated with reductions in lymphocyte subsets, including circulating helper and suppressor T cells, cytotoxic T lymphocytes, natural killer cells, and lymphocyte mitogenic responses.

---

[6] The complete document is available at http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2790329/ The document is authenticated under Fed. R. Evid. 901(b)(1), through the Declaration of Marianne Dugan, who downloaded it and attached it to her declaration. See Sams v. Geico Corp., CV No. 01-1458-BR, 2002 WL 31975065 * 3 (D. Or. 2002); In re Para, 2006 WL 2790451, at *3 (N.D. Cal. 2006). Furthermore, under Fed. R. Evid. 901(b)(4), it is self-authenticating based on its "distinctive characteristics" and under Fed. R. Evid. 902(7), trade inscriptions. Plaintiffs also ask that the Court take judicial notice of the document's authenticity under Fed. R. Evid. 201. See, e.g., Disabled Rights Action Committee v. Las Vegas Events, Inc., 375 F.3d 861, 866 n.1 (9th Cir. 2004).

Ex. L at 2.

A 2005 EPA fact sheet also discusses potential harm from 2,4-D,[7] making the following

relevant statements:

> The Agency has determined that a repeat 2-generation reproduction study using the current protocol is required to address both the concern for **thyroid** effects (comparative assessment between the young and adult animals) and **immunotoxicity**, as well as a more thorough assessment of the gonads and reproductive/developmental endpoints.

Ex. K at 3 (emph. added). "2,4-D has been in pre-Special Review status since September 22,

1986, because of carcinogenicity concerns. More specifically, there were concerns for

epidemiological links of 2,4-D to **non-Hodgkin's lymphoma** from both occupational and

residential exposure." Id. at 2 (emph. added). Although the EPA states at this time that there is

insufficient evidence to connect the dots between 2,4-D and non-Hodgkin's lymphoma, that link

is still being studied, as demonstrated by the 2009 article in Exhibit L.

"In longer-term studies, at dose levels above the threshold of saturation for renal

clearance, 2,4-D is toxic to the eye, thyroid, kidney, adrenals, and ovaries/testes." Ex. K at 3.

"Neurotoxicity was demonstrated following exposure to 2,4-D at relatively high dose levels." Id.

"In the preliminary and revised risk assessments, the estimated acute and short-term exposures

exceeded the Agency's level of concern." Id. at 5. "The EPA is requiring that registrants submit

toxicity data, including a developmental neurotoxicity study in rat; subchronic (28-day)

inhalation study; repeat two-generation reproduction study in rat using more recent protocol to

---

[7] The complete document is available at
http://www.epa.gov/oppsrrd1/REDs/factsheets/24d_fs.htm Ex. K.
As with the 2009 study, it is authenticated in Marianne Dugan's declaration. It is also self-authenticating as a "publication[] purporting to be issued by public authority." Fed. R. Evid. 902(5); Vote v. U.S., 753 F. Supp. 866, 868 (D. Nev. 1990), aff'd, 930 F.2d 31 (9th Cir. 1991).

addressing concerns for endocrine disruption." Id. at 9.

**E.    The Underlying Proceedings**

During argument on August 22, 2007, on the various summary judgment motions filed by Elms, Judge West offered repeatedly to go look at the property; but Schmeits would not agree. Aff. of Allen Hamilton at 4.  As explained herein, it would have been clearly seen by the Judge that:

• The old garage had not and could not be moved because of its dilapidated condition.

• Elms 8 foot security fence was set in concrete.

• Elms fence was only about 1 1/2 to 2 1/2 feet behind the Hamiltons' garage

• Elms could not drive behind the garage and along his fence line as he stated in affidavit, because there was not enough room.

• Elms could not get behind the garage because of the junk that had been piled up there.

• Elms could not walk along his fence line beyond the west corner of the garage because of a fence.

• Elms could not walk behind the Hamiltons' wood shed because there was another fence preventing access.

• The Hamiltons could not access their garage, wood shed, root cellar or back door if Elms blocked Sixth Street.

• The chemical smell was still noticeable at the time of the lawsuit.

• The small building the Hamiltons moved to the front of their property had nothing to do with the property dispute, and did not block any pre-existing access to the back of the property.

• The fence the Hamiltons built from the corner of the garage to the little building in front

was on their property.

Judge West dismissed some of the Hamiltons' counterclaims because Schmeits filed the response too late. Ex. 18 at 1-2; Ex. 20 at 3. He also rejected most of their summary judgment arguments, in large part because Mr. Schmeits had not submitted exhibits and affidavits in admissible form – the judge struck exhibits 1-5 and 8-23 because the pictures and map had writing on them, and the statements were not in affidavit form. Ex. 17 at 2.

The judge did give Schmeits leave to replead the Eighth Cause of Action (fraud), allowing him 30 days from On August 24, 2007, to do so. Defs' Ex. 17 at 3. But Schmeits did not replead the Eighth Claim for Relief on behalf of the Hamiltons. Instead, during the 30-day period, he filed a motion to allow him to withdraw as the Hamiltons' attorney. Ex. 27. He sent the Hamiltons a copy of the motion, with an unsigned order, with the dates left blank, with no explanation and no idea of how long they would have to find a new attorney. Ex. S at 2.

Mr. Schmeits then wrote a letter to the Hamiltons dated September 21, 2007, postmarked September 22, 2007, in which he advised the Hamiltons of the court's order allowing him to withdraw as their attorney. Lois Hamilton received this letter on the evening of September 25, 2007 – the day before the deadline to locate a new attorney and replead the Eighth Claim for Relief. Allen Hamilton Aff. at 4; Ex. S at 2. The order had been signed September 12 – 10 days before the postmark of Schmeits letter earlier – and it allowed the Hamiltons only 14 days from September 12, 2007, until September 26, 2007 – to obtain new counsel <u>and</u> to file an amended answer and counterclaim. Ex. Y; Ex. S at 2-3. The Hamiltons were unable to obtain counsel within one day. Ex. S at 2-3.

On September 26, the day after the Hamiltons got the letter from Schmeits with the order

allowing him to withdraw, Coughlin (Elms' attorney) filed a Motion for Summary Judgment for Dismissal of the Hamilton's 5th Claim, and another Motion for Summary Judgment Quieting Title Ejecting Defendants from Trespass, and of course those were granted because the Hamiltons had no counsel.  Exs. 15, 16, 18, 20; Aff. of Allen Hamilton at 4.

The Hamiltons did eventually end up getting an attorney to help with a motion to set aside default and to help with an appeal, but he concluded there were no appeal grounds and voluntarily dismissed the appeal.  While the case was pending at the Court of Appeals, the appellate mediator conveyed a suggestion from Elms that the Hamiltons sell their property to Mr. Elms for the reduced price of $35,000, since it was contaminated with chemicals.  Allen Hamilton Aff. at 4-5; Lois Hamilton Aff. at 6.  That offer was rejected.  Id.

## I.  PLAINTIFFS HAVE PRESENTED SUFFICIENT EVIDENCE ON THEIR CLAIM FOR TRESPASS AND ON DAMAGES

### A.  Plaintiffs Have Presented Sufficient Evidence on Liability

In two cases, Loe v. Lenhardt, 227 Or. 242, 362 P.2d 312 (1961), and Bella, 279 Or. 13, the Oregon Supreme Court held that chemical spraying is by nature an "ultrahazardous activity" which therefore imposes strict liability upon the owner of the land.  What that means is that the injured party does not have to prove that the applicator's trespass was negligent.  The injured party need only show that the chemicals landed on their property and injured them.  Trespass itself is basically a strict liability tort, and mistake of law or fact does not constitute a defense to trespass.  Gerdes v. Bohemia, 88 Or. App. 62, 744 P.2d 275 (1987).  If a trespass by chemicals occurs, "it is immaterial whether the defendant's conduct was careless, wanton and willful or entirely free from fault."  Martin v. Reynolds Metals Co., 221 Or. 86, 102, 342 P.2d 790 (1959). See also Worman, 223 Or. App. at 233 (county could be held liable for spraying chemicals that

harmed plaintiff and her property).

In <u>Bella</u>, the court reversed a directed verdict for defendants in a 2,4-D spraying case, explaining:

> When the harm threatened by the activity is very serious, even a low probability of its occurrence can suffice to invoke the standard. <u>See</u> <u>McLane v. Northwest Natural Gas Co.</u>, 255 Or. [324], 329, 467 P.2d 635 [(1970)]. Likewise, even when the risk only moderately threatens economic activities rather than harm to life, health, or property or environment, *see* O.R.S. 634.012, the activity may nevertheless be "abnormally dangerous" if it can be carried on only with a substantially uncontrollable likelihood that the damage will sometimes occur. That is what this court concluded about crop dusting or spraying in <u>Loe v. Lenhardt</u>, *supra*, where there was some dispute whether the particular formula used constituted a herbicide, 227 Or. at 249, 251, 362 P.2d 312. **However, with respect to 2,4-D the legislature itself has concluded that it falls within the concerns that prompted enactment of O.R.S. chapter 634, which are the danger of the regulated activities to health, property, wildlife, and environment.** O.R.S. 634.012 [now 634.005], 634.016(6), 634.026. **The 1973 revision of the statute specifically prohibited the use of "isopropyl ester of 2,4-D, or any other ester of equal or higher volatility with regard to plant damage" without a permit from the department,** O.R.S. 634.372(21), and permits to use 2,4-D are to be issued only upon a determination that its use "will not damage agricultural and forest products and susceptible crops." O.R.S. 634.322(10). In the light of this legislation, when damage does occur, it did not require proof for the court to decide that the aerial spraying of 2,4-D in the vicinity of broad-leafed crops is an abnormally dangerous activity within the standards set by <u>Loe v. Lenhardt</u>, supra, and its sequels.

279 Or. at 24-25 (emph. added). As explained *supra* at 8, Elms does not have a pesticide license, and sprayed the chemicals himself, and therefore in violated the relevant statutes. As explained *supra* at 8, there is also sufficient evidence for a factfinder to find that he is not credible when he states (now) that he stopped spraying the five foot strip of land after the Hamiltons bought the property; and to find that this constituted trespass.

Even intrusion by microscopic chemical compounds can constitute trespass. <u>Martin v. Reynolds Metals Co.</u>, 221 Or. at 94 (manufacturing operation of aluminum reduction plant caused certain fluoride compounds in the form of gases and particulates, invisible to the naked

eye, to become airborne and settle on owner's land, rendering it unfit for raising livestock and constituted direct trespass). Thus, in another <u>Reynolds</u> case, this time in federal court, Oregon gladiolus growers successfully asserted an action in trespass against the operator of an aluminum reduction plant because fluorides emanating from the plant had settled on their property, damaging gladiolus bulbs and blooms. <u>Reynolds Metals Company v. Lampert</u>, 316 F2d 272, 275, <u>adhered to on reh'g</u>, 324 F2d 465 (9th Cir 1963).

Even if Elms sprayed only on the five feet, it clearly entered the Hamiltons' property, as documented by the lab report and the observed plant die-off fifteen feet from the fence. As noted above, when chemicals travel from one property to another and harm the neighbor's property, the owner who applied the chemical is liable. Thus, in <u>Brown v. Johnston</u>, 258 Or. 284, 482 P.2d 712 (1971), the court allowed a verdict to stand where the neighbor had allegedly poisoned the roots of a tree, causing the foliage to "bec[o]me sparse, the leaves small and curled up at the edges, and 'one side of the tree had hardly any leaves on it at all.' By the time of trial, March 1970, some branches were either dead or dying and there was doubt if the tree would survive." The trunk of the tree was 3" to 6" from the defendants' property line. Prior to summer 1969, sycamore was healthy with heavy foliage and gave considerable shade to the plaintiffs' residence.

> The condition of the tree changed dramatically in the summer of 1969. . . . The best explanation offered at trial for the change in the tree's condition came from the testimony of plaintiffs' expert witness, . . . who testified that the condition was caused by a "massive dose" of growth regulator herbicide absorbed through the tree's root system.

There was evidence that the neighbors had used the suspected herbicide, and had excavated **on their own property but "at the immediate base of the sycamore tree."**

There is more than enough evidence in the instant case to allow a factfinder to find that

Elms applied 2,4-D and that that application of chemicals trespassed on plaintiffs' property, harming them and their property. And of course, if the finder of fact decided that the Hamiltons owned the five-foot strip under one of their legal theories, the application of chemicals to the five-foot strip itself would clearly be trespass.

**B.      Plaintiffs Have Presented Sufficient Evidence of Damages from the Trespass**

Plaintiffs have been damaged not only by the rashes and other symptoms, and the poisoning of their garden food, but also by the fear of becoming ill, an injury recognized in Zehr v. Haugen, 318 Or. 647, 656-57, 871 P.2d 1006 (1994), as discussed directly *infra*. Plaintiffs had to leave the property in summer 2006, and were not comfortable renting it again until 2009, and even then advised the tenant not to plant a garden. Allen Hamilton Aff. at 3-4; Lois Hamilton Aff. at 4. The Hamiltons turned in a claim on their homeowners insurance because of the chemical damage to their property, but it was later determined that they were not covered for that kind of damage. Allen Hamilton Aff. ¶ 3.

The Oregon Supreme Court has specifically held that damages for mental anguish are recoverable when they are the result of the defendant's interference with the use and enjoyment of the plaintiff's land. Edwards v. Talent Irrigation District, 280 Or. 307, 309-10, 570 P.2d 1169 (1977); Macca v. Gen. Telephone Co. of N.W., 262 Or. 414, 418, 495 P.2d 1193 (1972). The Edwards rule was clarified in McGregor v. Barton Sand & Gravel, Inc., 62 Or. App. 24, 32, 660 P.2d 175 (1983), in which the court concluded that emotional distress damages for interference with the use and enjoyment of land is as applicable in intentional trespass actions as in negligence or nuisance actions.

Where the plaintiff alleges that she has suffered present physical harm as a result of

defendants' negligence, she may seek damages for her fear of developing cancer, for the increased risk of developing cancer that she faces, or for the costs of medical care to determine the extent of her harm.  Lowe v. Philip Morris USA, Inc., 344 Or. 403, 409, 183 P3d 181 (2008) (citing Zehr).  In Lowe, the court denied such damages because there was no present physical harm.  In doing so, the court distinguished from Zehr, in which the court recognized that, when a defendant's negligence causes bodily injury, the plaintiff can recover damages for past, present, and future medical expenses, bodily injury, and emotional distress.  See also Doe v. American Red Cross, 322 Or. 502, 506, 515, 910 P.2d 364 (1996) (court implicitly assumed that decedent negligently given HIV-infected blood had suffered present physical injury and could have brought negligence action as of date he tested positive for HIV, even though there was no indication that he suffered medical symptoms of harm at that time).

Here, as discussed *supra*, it is undisputed in the summary judgment record that the 2,4-D spraying caused rashes and dead plants; that the plaintiffs ingested those garden plants before learning that they had been sprayed with 2,4-D; and that the level of 2,4-D in the soil on the area undisputedly owned by the Hamiltons was "abnormally high."  That is sufficient to present a claim for damages for plaintiffs' fear of developing cancer, for the increased risk of developing cancer, and for the costs of medical care to determine the extent of their harm.

Plaintiffs have presented sufficient evidence to allow a factfinder to find that they were physically impacted by Elms' trespass to their property, and that they thereby suffered damages that are cognizable under Oregon law.

## II.     PLAINTIFFS' HAVE PRESENTED SUFFICIENT EVIDENCE TO SUPPORT THEIR CLAIM FOR OWNERSHIP BY ESTOPPEL

Boundary by estoppel is demonstrated by (1) a representation that the claimed boundary

line is the true boundary line, and (2) a reliance on that representation. <u>Satchell v. Dunsmoor</u>, 179 Or. 463, 488, 172 P.2d 826 (1946). Based on the evidence presented herein, a reasonable factfinder could find that Elms represented, in selling the property without showing the true property line, that the fence was the property line; and that the Hamiltons reasonably relied on that representation.

Mr. Elms knew exactly where the property line was in 1986 when he subdivided the property and sold it to the Hansens, because he had done a survey in 1982. Yet the Hansens believed they owned up to the fence line, as discussed *supra* at 3. Mr. Emery, although he later tried to backpedal his way out of his statement, stated that he too believed he owned up to the fence, and Elms never used the area south of the fence. *Supra* at 3-5. Hamiltons reasonably believed the same thing, because of Elms' failure to tell them where the real property line is. *Supra* at 6-7.

In <u>Clark v. Hindman</u>, 46 Or. 67, 75, 79 P. 56 (1905), the court held that "a party is estopped to deny the line between his own and the adjoining land to be the true line if he has sold and conveyed land up to such line, has pointed it out as the true line and has induced the defendant to purchase up to such line." <u>See also</u> <u>Reisland v. Schick</u>, 111 Or. 42, 224 P. 827 (1924) ("His representation was that he knew where the true boundary line was. As a matter of fact he did not know where it was. This representation was false, and since the defendants relied upon his supposed knowledge and were misled to their injury, his representation thus recklessly and negligently made was, in law, as much a false and fraudulent representation as if, knowing where the true boundary line was, he falsely represented it to be elsewhere").

//////

### III.  PLAINTIFFS HAVE PRESENTED SUFFICIENT EVIDENCE TO SUPPORT THEIR CLAIM FOR EASEMENT BY PRESCRIPTION/ADVERSE POSSESSION

The issues regarding the easement by prescription and adverse possession claims are virtually identical.

Manderscheid v. Dutton, 193 Or. App. 9, 88 P.3d 281 (2004), is a case on all fours with the instant case.  The court affirmed quiet title for the adverse possessor, relying heavily on the fact that there was a fence.  The court noted that the fence was reasonably presumed to be the boundary, as there were no other boundary indicators, and the buildings were on the boundary line.  Summary judgment for defendants would be inappropriate when issues of fact form the core of an adverse possession case.

Along the same lines, the construction of a fence has been held to constitute sufficient notice of open and notorious use.  Davis v. Parke, 135 Or. App. 283, 288, 898 P.2d 804, rev. denied, 321 Or. 560 (1995); Slak v. Porter, 128 Or. App. 274, 875 P.2d 515 (1994).

When the parties are strangers, having no arrangements between them, mere possession that is open and continuous raises a presumption of hostility.  Springer v. Durrette, 217 Or. 196, 201-02, 342 P.2d 132 (1959).  See also Faulconer v. Williams, 147 Or. App. 389, 394, 936 P.2d 999 (1997); Davis, 135 Or. App. at 286 (honest, objective, and reasonable mistaken belief of ownership satisfies element of hostility); Almond v. Anderegg, 276 Or. 1041, 1045, 557 P.2d 220 (1976) (if mistaken belief of ownership is reasonable ("pure"), hostile intent is presumed).

Mere acquiescence is insufficient to defeat prescription.  Kondor v. Prose, 50 Or. App. 55, 60-61, 622 P.2d 741 (1981).

Both the "actual possession" and "exclusivity" factors simply require the type of use that

an average owner would make of the land.  <u>Davis</u>, 135 Or. App. 283; <u>Overton v. Blake</u>, 274 Or.

91, 93, 544 P.2d 1037 (1976); <u>Kitzerow v. Reinhardt</u>, 74 Or. App. 582, 704 P.2d 132 (1985);

<u>Hopkins v. State of Oregon</u>, 96 Or. App. 717, 720-21, 775 P.2d 825 (1989).

Regarding the "under a claim of right or color of title" factor, in <u>Garrett v. Lundgren</u>, 41

Or. App. 23, 596 P.2d 1318 (1979), the court held that a party asserting adverse possession need

not prove "ownership" of the land for the statutory period, but rather open, hostile, exclusive

"use" if the party is relying on possession under claim of right rather than color of title.

Plaintiffs have presented evidence that would allow a factfinder to believe that they and

their predecessor in title (Emery), for a period of more than ten years (1992 to 2005), reasonably

and honestly, openly and notoriously and hostilely, believed they owned the property up to the

fenceline, and, under a claim of right, actually possessed and used that property exclusively as

their own, including the use of a garage that actually straddles the fenceline.  That is sufficient to

support adverse possession over the entire strip, or at the very least a prescriptive easement for

use of the strip.

## IV.    PLAINTIFFS HAVE PRESENTED SUFFICIENT EVIDENCE TO SUPPORT THEIR CLAIM FOR EASEMENT BY IMPLICATION

An implied easement is an easement that exists by inference when the circumstances that

exist at the time of severance of a parcel establish that the grantor of the parcel intended to create

an easement.  <u>Tyska v. Prest</u>, 163 Or. App. 219, 988 P.2d 392 (1999); <u>Wayt v. Buerkel</u>, 128 Or.

App. 222, 231, 875 P.2d 499, <u>modified on recons</u>, 129 Or. App. 119, 816 P.2d 868 (1994).

"The essence of an easement by implication is that, when an interest in land is conveyed

and the grant contains no express creation of an easement, one may be implied as an intended

part of the transaction."  <u>Smo v. Black</u>, 93 Or. App. 234, 238, 761 P.2d 1339 (1988).  The intent

of the parties is inferred from the circumstances under which the conveyance was made, <u>Cheney</u>

<u>v. Mueller</u>, 259 Or. 108, 485 P.2d 1218 (1971).

The determination of the existence of an implied easement is <u>inherently factual</u> and

involves a weighing of numerous factors, including those listed in the Restatement of Property §

476 (1944). <u>Thompson v. Schuh</u>, 286 Or. 201, 212, 593 P.2d 1138 (1979) (listing factors).

<u>Bloomfield v. Weakland</u>, 193 Or. App. 784, 92 P.3d 749, 756 (2004), <u>aff'd</u>, 339 Or. 504, 123

P.3d 275 (2005). <u>See</u> <u>Bloomfield</u>, 193 Or. App. 784, 92 P.3d at 758 (denying summary

judgment).

In <u>Penny v. Burch</u>, 149 Or. App. 15, 941 P.2d 1049 (1997), the Court found as follows:

> An implied easement may arise when the owner of land held under one title conveys part
> of the land to another. If there was a previous apparent and permanent use of the land
> that is important for the enjoyment of the parcel that the common owner sold, the courts
> may imply that the purchaser received an easement, measured by the pre-existing use,
> over the parcel that the common owner retained. Although there are many factors to
> consider, the essential question is whether a reasonable purchaser would be justified in
> expecting the easement under the circumstances which he or-she-purchased the land.
> There must be a reason for assuming that a right to continue using the quasi-easement is
> part of the bargain.

<u>Garrett v. Mueller</u>, 144 Or. App. 330, 341, 927 P.2d 612 (1996), <u>rev. den.</u> 324 Or. 560 (1997).

In the instant case, a reasonable finder of fact could find that Elms intended to provide an

easement to the purchaser when he subdivided his property – he did a survey "for the purpose of

monumenting property lines for fence construction" (Ex. B), built the fence himself (Ex. D at 6-

11), and (the jury could believe) never told any of the three parties who purchased the property

from him that he owned the five-foot strip south of the fence. The evidence would also allow

the factfinder to find that the "previous apparent and permanent use" that was 'important for the

enjoyment of the parcel" was using the area up to the fence for normal uses – such as using it as

a grassy area that was "part of the yard" for Emery – and it was reasonable for the Hamiltons to believe that was part of the bargain.  As for the garage, it is in fact <u>unreasonable</u> to believe that someone would purchase property with the understanding that he would have to move a shed that is straddling a boundary line.

There is sufficient evidence to support a claim for easement by implication.

## V.   PLAINTIFFS HAVE PRESENTED SUFFICIENT EVIDENCE TO SUPPORT THEIR CLAIM FOR FRAUD IN THE SALE OF REAL PROPERTY

As explained *supra* at 16, the fraud claim was the single claim the judge allowed the Hamiltons to replead rather than dismissing.  As also explained *supra*, Mr. Schmeits instead withdrew, without repleading and without leaving his clients in a position of safety, and the claim was dismissed.

Schmeits now argues that there is no evidence of a false representation made by Elms regarding the sale of the property.  As explained throughout this brief, that is an intensely contested issue of material fact, and it would be inappropriate to grant summary judgment to defendants on that claim.

Whether alleged misrepresentations were "material" or 'substantial" is an issue of fact. <u>Arboireau</u>, 347 F.3d 1158; <u>Venture Properties</u>, 223 Or. App. at 353.  Credibility and weight of the eyewitness' testimony are also questions of fact.  <u>State v. Krummacher</u>; 269 Or. at 144; <u>Oregon v. Miller</u>, 53 Or. App. at 498.  "[W]hen a trial court is confronted with a nonmoving party's inconsistent statements, it may not evaluate the credibility of an explanation in the later of the statements to resolve the factual conflict.  <u>Taal v. Union Pacific Railroad Co.</u>, 106 Or. App. 488, 494, 809 P.2d 104 (1991)."  <u>Edwards v. Saleen-Degrange</u>, 161 Or. App. 156 (reversing summary judgment where affidavits gave conflicting versions of events).

A material representation is one which would be a critical factor in the purchaser's decision to consummate the transaction, or would have a considerable bearing on the purchase price, and structural defects or physical deficiencies are generally held to be material. <u>See</u> <u>Millikin v. Green</u>, 283 Or. 283, 285, 583 P.2d 548 (1978) (leaky roof is material); <u>Holland v. Lentz</u>, 239 Or. 332, 397 P.2d 787 (1964) (insulation problem costing $1,279 to repair); <u>Zeleny v. Karnosh</u>, 224 Or. 419, 356 P.2d 426 (1960); <u>Kinkade v. Markus</u>, 38 Or. App. 131, 135, 589 P.2d 1142 (1979) (inadequate water supply).

Nondisclosure of material defects, even without false statements, constitutes fraudulent misrepresentation if the seller or broker knew of the defects and intended to deceive the buyer. <u>Banks v. Martin</u>, 78 Or. App. 550, 717 P.2d 1192 (1986); <u>In re Greene</u>, 290 Or. 291, 620 P.2d 1379 (1980); <u>Millikin</u>, 283 Or. at 285 (defendant builder failed to disclose that roof on new dwelling would have to be replaced).

Nondisclosure of a known fact material to the transaction is actionable fraud. <u>Whitlatch v. Bertagnolli</u>, 45 Or. App. 985, 609 P.2d 902 (1980). Where a seller, by conduct or words, creates a false impression concerning a matter of vital importance to the buyer, failure to fully disclose all relevant facts constitutes fraudulent misrepresentation. <u>See</u> <u>Elizaga v. Kaiser Foundation Hospitals, Inc.</u>, 259 Or. 542, 487 P.2d 870 (1971); <u>Pennebaker v. Kimble</u>, 126 Or. 317, 269 P 981 (1928). Once a seller undertakes to speak, he or she is under a duty to make a full and fair disclosure, and may not reveal only incomplete or partial information. <u>See</u> <u>In re Greene</u>, <u>supra</u>; <u>Krause v. Eugene Dodge, Inc.</u>, 265 Or. 486, 505, 509 P.2d 1199 (1973); <u>Heise v. Pilot Rock Lbr. Co.</u>, 222 Or. 78, 90, 352 P.2d 1072 (1960); <u>Musgrave v. Lucas</u>, 193 Or. 401, 238 P.2d 780 (1952).

Where a seller leads a buyer to believe in a false state of affairs, the buyer may rely upon these misrepresentations unless he is put on notice as to a different condition. See Gearhart v. Goehner, 74 Or. App. 95, 100-01, 701 P.2d 461 (1985). For instance, in Haag v. Cembellin, 89 Or. App. 75, 748 P.2d 143, rev. den., 305 Or. 273, 752 P.2d 1219 (1987), purchasers were held to have adequately investigated the effect of a proposed development on their view, and had the right to rely on the developer's statement that the development would not affect the view, where the developers did not inform the buyers of the existence of architectural plans.

Although purchasers are generally not justified in relying on mere opinion, if statements which are of the nature of an opinion are made with the intent to deceive and misrepresent existing facts, the statements constitute actionable fraud. See Patterson v. Western L. & B. Co., 155 Or. 140, 62 P.2d 946 (1936); Howard v. Merrick, 145 Or. 573, 27 P.2d 891 (1933); Prosser on Torts § 109.

There is sufficient evidence for a factfinder to determine that Elms fraudulently misrepresented the boundary, or failed to disclose that the actual boundary was south of the fence, which he was undisputedly aware of; and that the buyers reasonably relied on those misrepresentations.

## VI.  PLAINTIFFS CONCEDE THREE CLAIMS

After reviewing defendants' motions, plaintiffs concede the following claims: breach of contract against Schmeits; easement by ordinance; and cross claim against American General Finance, Inc. Defendants' counsel did not specifically confer on these issues, which are minor in relation to the central legal and factual issues in this case; and the briefing was quite sparse; had the arguments been presented prior to the filing of the motion for summary judgment plaintiffs

would have conceded at that time. Decl of Dugan ¶ 2.

**CONCLUSION**

Based on this brief and the declarations and exhibits filed herewith and on record,

plaintiffs respectfully request that the court deny defendants' motion for summary judgment.

Respectfully submitted April 3, 2011.

    /s/ Marianne Dugan
Marianne Dugan, OSB # 93256
Attorney for Plaintiffs
259 E. 5th Ave., Suite 200-D
Eugene, Oregon 97401
(541) 338-7072
Fax number (866) 650-5213
mdugan@mdugan.com